FARHANG & MEDCOFF
4801 E. Broadway Boulevard, Suite 311
Tucson, Arizona 85711
T: 520.790.5433
F: 520.790.5736

Timothy M. Medcoff (#019204)
tmedcoff@fmazlaw.com

Roberto C. Garcia (#026246)
rgarcia@fmazlaw.com

Attorneys for NatureSweet USA, LLC

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| NatureSweet USA, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>Alberto Aceves Cornejo and Karla Giovanna Marquez Junquera, husband and wife,<br><br>Defendant. | **COMPLAINT** |

NatureSweet USA, LLC for its Complaint against Alberto Aceves Cornejo and Karla Giovanna Marquez Junquera, alleges as follows:

**PARTIES**

1. Plaintiff NatureSweet USA, LLC ("NSU") is a Delaware limited liability company whose headquarters and principal place of business is in San Antonio, Texas. NSU is authorized to conduct business in Arizona and operates primarily out of its facilities in Willcox, Arizona.

2. For purposes of determining subject matter jurisdiction, NSU is a citizen of Delaware

and Texas.

3. Defendant Alberto Aceves Cornejo ("Aceves") is a California resident. Defendant Karla Giovanna Marquez Junquera ("Junquera"), who is also a California resident, is the spouse of Aceves. At all times relevant to this action, Aceves and Junquera acted for and on behalf of their marital community. Each of Aceves, Junquera, and their marital community is liable to NSU as alleged herein.

4. For purposes of determining subject matter jurisdiction, Aceves and Junquera (collectively, "Defendants") are residents of California and are citizens of Mexico, a foreign state.

## JURISDICTION

5. This Court has subject matter jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(a)(2) because the amount in controversy exceeds $75,000 and because this is an action between a citizen of a State (NSU is a citizen of Delaware and Texas) and citizens or subjects of a foreign state (Mexico). Defendants are citizens of Mexico and reside/are domiciled in California.

6. Pursuant to Fed. R. Civ. P. 4(k), this Court has personal jurisdiction over Defendants because Defendants are subject to the jurisdiction of the state courts of general jurisdiction in the District of Arizona. Without limitation, Defendants, through their actions giving rise to the claims asserted herein, had minimum contacts with the State of Arizona sufficient to establish jurisdiction in Arizona state courts and, further, conducted business in, and purposefully availed themselves of, the State of Arizona.

## VENUE

7. Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because "a substantial part of the events or omissions giving rise to the claim[s] occurred" in the District of Arizona.

## GENERAL ALLEGATIONS

8. In or around February 2016, NSU hired Aceves to the position of "Greenhouse Grower" at its facility in Willcox, Arizona.

9. Aceves' duties included, without limit, oversight of daily operations and strategic planning for the Willcox facility, monitoring the performance of plant varieties, managing and controlling pests and diseases within company and industry guidelines, and strict documentation of all such work.

### The Relocation Loan

10. As a benefit incident to his employment with NSU, and the relocation required in connection therewith, NSU provided Aceves with an international relocation loan in the amount of $40,000. Such loan was for a term of 36 months and bears interest at the rate of 4% per annum (the "Loan").

11. NSU and Aceves (collectively, the "Parties") agreed that, if Aceves' employment with NSU ended for any reason prior to the Loan being repaid in full, the entire Loan balance would become due immediately.

12. The Parties also agreed that Aceves would repay the Loan in installments, each installment in the amount of $545.06. The Parties agreed the installments would be automatically deducted from Aceves' bi-weekly paychecks.

13. Aceves executed writings acknowledging the Loan and the applicable repayment terms.

14. Up and until the termination of his employment, the Parties each performed their obligations relating to the Loan. Among other things, NSU provided the Loan, and Aceves made bi-weekly installments on the Loan.

15. Aceves' employment with NSU ended on December 31, 2016.

16. Pursuant to their agreement, the Loan balance remaining upon termination of Aceves' employment with NSU became due immediately.

17. Despite demand, Aceves failed to pay the balance on the Loan after his employment with NSU ended, and failed to make any further payment on the Loan.

18. During his employment with NSU, Aceves made payments toward the Loan balance totaling $5,995.66.

19. A principal balance of $34,004.34 remains outstanding on the Loan and continues to

1 accrue interest at a rate of 4% per annum, or $3.73 per day.

2 20. As of March 22, 2017, the total interest accrued under the Loan is no less than
3 $302.13, and interest continues to accrue.

Aceves' Willful Destruction of NSU Property

5 21. NSU and Aceves entered into that certain Assignment and Confidentiality
6 Agreement for New Employees (the "AC Agreement").

7 22. In the AC Agreement, in furtherance of various obligations under Arizona law,
8 Aceves agreed, without limit, that all the information he developed and/or encountered in
9 the course and scope of his employment was property of NSU (the "Documentation").

10 23. One of Aceves' most important duties as NSU's Greenhouse Grower was to monitor
11 and ensure adherence with soil/nutrient formulas and processes intended to optimize the
12 growth of the plants in NSU's greenhouses.

13 24. As growing conditions changed, NSU used such formula/process information to
14 make modifications to its plant growth efforts. The necessary modifications depended on
15 historical data and prior analyses. Indeed, NSU could not make appropriate, critical
16 adjustments to its plan growth efforts without the historical data compiled by growers such
17 as Aceves (part of the Documentation).

18 25. The Documentation was also critical for various quality control and certification
19 purposes (e.g., certification of products as organic).

20 26. The development of the Documentation was costly and time consuming for NSU,
21 which dedicates significant resources to the development and maintenance of the
22 Documentation.

23 27. During his employment with NSU, Aceves represented that the growth
24 formulas/processes in the Documentation would yield an increase in production of 33%.
25 NSU incorporated such an increase into its production projections and expended resources
26 to achieve the anticipated increase.

27 28. Aceves stored the Documentation on an NSU-provided laptop computer.

28 29. The AC Agreement required Aceves, at the termination of his employment for any

reason, to return all Documentation to NSU.

30. Rather than comply with this obligation, Aceves purposefully, maliciously, and permanently deleted the Documentation that was in his possession and on the NSU-provided laptop. Despite diligent and good faith efforts, NSU was unable to recover the Documentation from the NSU-provided laptop.

31. This Documentation was of critical and substantial value to NSU. Given its destruction, NSU was unable to determine what adjustments had been made relating to the plant growth process (if any), and what adjustments should be made to reach production quotas.

32. NSU's inability to make the aforementioned adjustments caused it substantial harm by causing it to fall far short of its anticipated production goals.

33. NSU is a sophisticated and experienced tomato grower. NSU, however, was unable to call upon its other growers or its experience to prevent the harm/damages caused by Aceves because Aceves' work was the first attempt by NSU (and, upon information and belief, by any other commercial grower) to grow and take to market organic roma tomatoes.

34. For the first 7 weeks of 2017, NSU fell far short of its production projections. NSU missed its production projections by 250,680 pounds in January 2017, and 209,340 through the third week of February 2017. NSU's production continues to fall short of expectations through the date of this filing, and such shorts will be ongoing. Aceves is liable for all such shorts and the resulting damages.

35. But for Aceves' destruction of the Documentation, NSU would have attained production levels much closer to, at, or perhaps above its projected figures. At a minimum, and based upon Aceves' promises that the formulas/processes in the Documentation would yield higher outputs by 33%, NSU would have attained production of an additional approximately 266,610 pounds of tomatoes through the seventh week of 2017, which would have yielded approximately $514,557 in additional profit to NatureSweet. Aceves is also liable for all lost profits/damages arising from the period after the seventh week of 2017.

/ / / /

## COUNT I – BREACH OF CONTRACT

36. NSU incorporates herein by this reference each and every preceding paragraph as though fully set forth herein.

37. The Parties entered into an agreement, incident to Aceves' employment with NSU, under which NSU provided the Loan to Aceves.

38. The Parties performed their obligations relating to the Loan when NSU deducted bi-weekly installments on the Loan, and when Aceves made payment on the Loan through these same installments.

39. Aceves breached his agreement with NSU regarding the Loan when he failed to pay the remaining balance upon termination of his employment with NSU, which occurred on December 31, 2016.

40. NSU sustained damage as a result of Aceves' breach of the Loan agreement. NSU is entitled to recovery of the remaining balance, $34,004.34, accrued interest in an amount not less than $302.13, and interest that continues to accrue at a rate of 4% per annum or $3.73 per day.

41. The Parties also entered into the AC Agreement.

42. Aceves violated the AC Agreement when he, among other things, failed to return the Documentation to NSU at the end of his employment. Aceves also violated the AC Agreement when he purposefully, maliciously, and permanently deleted the Documentation from his NSU-provided laptop in an effort to cause harm to NSU.

43. NSU sustained and will continue to sustain significant damages as a result of Aceves' breach of the AC Agreement. Without limitation, Aceves' breach of the AC Agreement caused NSU to incur a substantial loss of reasonably expected profits, in an amount not less than $514,557.

44. Pursuant to A.R.S. §§ 12-341 and 12-341.01, and the AC Agreement, because this dispute arises from contracts, NSU is entitled to its attorneys' fees and costs incurred in connection with this action and in connection with the enforcement of NSU's rights.

45. Defendants are liable for all damages resulting from Aceves' actions or omissions.

**COUNTI II – BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**

46. NSU incorporates herein by this reference each and every preceding paragraph as though fully set forth herein.

47. Arizona law implies a covenant of good faith and fair dealing into every contract.

48. The Parties entered into contracts by which, among other things, Aceves agreed to pay the remaining balance on the Loan at the end of his employment with NSU. Aceves also agreed to return all NSU property, including the Documentation, at the end of the Parties' employment relationship.

49. NSU performed all its duties and obligations under the contracts between the Parties.

50. Regardless of the specific language of the contracts, NSU's reasonably expected benefits of its bargain with Aceves also included the expectation arising from law that Aceves would not seek to do NSU harm by deleting information critical to NSU's operation (i.e., the Documentation).

51. Such expectations, and a separate duty of good faith and fair dealing, also arose independently from the contracts pursuant to A.R.S. § 23-1501(A)(1) because Aceves' relationship with NSU was based on an implied contractual employment relationship.

52. Aceves breached his duty of good faith and fair dealing under law by, without limit, destroying the Documentation while still employed by NSU and receiving remuneration from same.

53. Aceves' known and unknown breaches of the duty of good faith and fair dealing caused NSU damages in an amount to be proven at trial; such damages include, but are not limited to, disgorgement of Aceves' wages paid to him while he was committing acts intended to harm and undermine NSU, data recuperation and/or recreation costs, loss of goodwill, and lost profits, among other things.

54. Because this claim for relief arises from an express or implied contract and the reasonable expectations flowing therefrom, NSU is entitled to an award of attorneys' fees and costs pursuant to the contracts and/or A.R.S. §§ 12-341 and 12-341.01.

55. Defendants are liable for all damages resulting from Aceves' actions or omissions.

## COUNT III – BREACH OF DUTY LOYALTY

56. NSU incorporates herein by this reference each and every preceding paragraph as though fully set forth herein.

57. As an employee of NSU, Aceves owed NSU a fiduciary duty of loyalty, which included obligations to act fairly, honestly, and in good faith.

58. During the course of his employment with NSU, as part of his fiduciary duty of loyalty to NSU, Aceves owed NSU an obligation to act with the care, competence, and diligence normally exercised by employees in similar circumstances.

59. During the course of his employment with NSU, as part of his fiduciary duty of loyalty to NSU, Aceves owed NSU an obligation not to act in a manner that would cause purposeful harm or damage to NSU.

60. During the course of his employment with NSU, as part of his fiduciary duty of loyalty to NSU, Aceves owed NSU an obligation to preserve and protect valuable company information, particularly such information that NSU developed at great effort and expense.

61. While still employed by NSU and prior to the termination of his employment, while he still had access to NSU's computer files, Aceves violated the aforementioned duties and obligations when he purposefully, maliciously, and permanently deleted the Documentation.

62. Despite diligent efforts, NSU was unable to recover the Documentation Aceves destroyed. As a result, NSU has incurred and will continue to incur significant damages in an amount to be determined at trial.

63. As a result of Aceves' unlawful conduct, NSU has sustained damages to date in an amount not less than $514,557. This amount consists of lost profits NSU would have realized had it been able to reap the benefits of the information in the Documentation, and the benefits of Aceves' services while employed by NSU.

64. Aceves' breaches of the aforementioned duties and obligations conduct was gross, wanton, malicious, oppressive, and performed with spite, ill will, and reckless indifference for the interests of others. Aceves' unlawful and unfair conduct entails an evil hand guided

by an evil mind. As a result, Aceves is liable for punitive damages as well as general damages in an amount to be proven at trial, but in no event less than $514,557.

65. Defendants are liable for all damages resulting from Aceves' actions or omissions.

## COUNT IV – UNJUST ENRICHMENT

66. NSU incorporates herein by this reference each and every preceding paragraph as though fully set forth herein.

67. NSU asserts this unjust enrichment claim in the alternative and in the event the Court determines that NSU's other claims fail or are not applicable in this case.

68. Aceves has been enriched by his improper and unlawful conduct alleged elsewhere herein. For example, and without limitation, Aceves has profited from retaining monies NSU loaned him incident to his employment.

69. NSU has been impoverished by Aceves' improper and unlawful conduct. NSU's impoverishments include, but are not limited to, loss of valuable property in the form of money loaned and not repaid.

70. NSU's impoverishment is a direct consequence of Aceves' improper and unlawful conduct.

71. Aceves' retention of monies belonging to NSU is unjustified and unlawful.

72. NSU has no adequate remedy at law that would either disgorge Aceves' improper, unlawful retention of NSU's moneys or that would create a constructive trust for NSU.

73. The actions of Aceves have caused considerable damage to NSU in an amount to be proven at trial, but in no event less than $34,004.34, plus interest at the maximum rate allowed under law.

74. Defendants are liable for all damages resulting from Aceves' actions or omissions.

**WHEREFORE**, NSU respectfully requests that the Court:

a) Enter judgment for NSU and against Defendants on all counts;

b) Award NSU all recoverable damages including, without limit, all NSU's direct, incidental, compensatory, and consequential damages, in an amount to be proven at trial, but in no event less than $548,883.47;

c)   Award NSU its taxable costs and reasonable attorneys' fees incurred during NSU's investigation of Defendants' breaches, and such costs and attorneys' fees incurred herein pursuant to the contracts referenced in this Complaint and A.R.S. §§ 12-341 and 12-341.01;

d)   Award NSU pre- and post-judgment interest at the highest rate allowed by law; and

e)   Grant NSU any other relief that the Court deems just and proper under circumstances.

DATED this 23rd day of March, 2017.

FARHANG & MEDCOFF

By /s/ Roberto C. Garcia
   Timothy M. Medcoff
   Roberto C. Garcia

Attorneys for NatureSweet USA, LLC